UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ELAINE J. LONG,

                                        Plaintiff,

v.                                                                      6:03-CV-0626
                                                                        (DNH/GHL)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.
_____

APPEARANCES:                              OF COUNSEL:

OFFICE OF PETER W. ANTONOWICZ             PETER W. ANTONOWICZ, ESQ.
Counsel for Plaintiff
1300 Floyd Avenue
Rome, New York 13440-4600

HON. GLENN T. SUDDABY                     WILLIAM H. PEASE, ESQ.
United States Attorney for the            Assistant United States Attorney
     Northern District of New York
Counsel for Defendant
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York 13261-7198


GEORGE H. LOWE, United States Magistrate Judge

## REPORT AND RECOMMENDATION

        This matter was referred to the undersigned for report and recommendation by the

Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and

Northern District of New York Local Rule 72.3.  This case has proceeded in accordance with

General Order 18 of this Court which sets forth the procedures to be followed when appealing a

denial of Social Security benefits.  Both parties have filed briefs.  Oral argument was not heard.

For the reasons discussed below, I find that substantial evidence supports Defendant's

assessment of Plaintiff's credibility and of her ability to perform light work.  However, I recommend that the case be remanded to the Commissioner to elicit Vocational Expert ("VE") testimony in light of Plaintiff's nonexertional limitations.

## I.      BACKGROUND

### A.      Procedural History

Plaintiff applied for disability insurance benefits on March 20, 1996. (Administrative Transcript ("T") at 93-96.)  The application was denied on August 5, 1996.  (T. at 63-64.)  Plaintiff requested reconsideration.  (T. at 65.)  The request for reconsideration was denied.  (T. at 66-67.)

Plaintiff filed a second application for disability insurance benefits on September 10, 1998.  (T. at 97-99.)  The second application was denied on December 2, 1998.  (T. at 69-72.)  Plaintiff requested reconsideration.  (T. at 73-75.)  The request for reconsideration was denied.  (T. at 76-78.)  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (T. at 79-80.)  The hearing was held on September 28, 1999.  (T. at 28-57.)  On December 8, 1999, the ALJ issued a decision finding that Plaintiff was not disabled.  (T. at 15-25.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on March 28, 2003. (T. at 6-9.)  Plaintiff commenced this action on May 21, 2003.  (Dkt. No. 1.)

### B.      The Contentions

Plaintiff makes the following claims:

(1)      The ALJ's determination that Plaintiff retains the residual functional capacity ("RFC") to perform light work is not supported by substantial evidence.  (Dkt. No. 8 at 8-18.)

(2)     The ALJ erred by rejecting Plaintiff's subjective complaints of pain.  (Dkt. No. 8 at 21-24.)

(3)     The ALJ erred by failing to consult a VE.   (Dkt. No. 8 at 22.)

Defendant contends that the ALJ's decision is supported by substantial evidence and thus should be affirmed.  (Dkt. No. 10.)

## II.     APPLICABLE LAW

### A.     Standard for Benefits

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A) (2004).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which exists
> in the national economy, regardless of whether such work exists in the
> immediate area in which he lives, or whether a specific job
> vacancy exists for him, or whether he would be hired if he applied
> for work.

42 U.S.C. § 1382c(a)(3)(B) (2004).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. §§ 405(a), 1383(d)(1)), the Social Security Administration ("SSA") promulgated regulations establishing a five-step sequential evaluation process to determine disability.  20 C.F.R. § 416.920 (2007).  "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further."

3

*Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

> At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."  [20 C.F.R.] §§ 404.1520(b), 416.920(b).  At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [20 C.F.R.] §§ 404.1520(c), 416.920(c).  At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [20 C.F.R. §§] 404.1520(d), 416.920(d).  If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.  [20 C.F.R.] §§ 404.1520(f), 404.1560(c), 416.920(f), 416.9630(c).

*Barnhart v. Thomas*, 540 U.S. at 24-25 (footnotes omitted).

The plaintiff-claimant bears the burden of proof regarding the first four steps.  *Serrano v. Barnhart*, Civ. No. 02-6372, 2003 WL 22683342, at *11 (S.D.N.Y. Nov. 14, 2003).  If the plaintiff-claimant meets his or her burden of proof on all four steps, the burden then shifts to the defendant-Commissioner to prove that the plaintiff-claimant is capable of performing other jobs which exist in significant numbers in the national economy.  *Id.* (citing *Barnhart v. Thomas*, 540 U.S. at 25; other citations omitted).

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.

*Brown v. Barnhart*, Civ. No. 02-4523, 2003 WL 1888727, at *4 (S.D.N.Y. Apr. 15, 2003);

*Serrano v. Barnhart*, 2003 WL 22683342, at *10; *Rosado v. Sullivan*, 805 F. Supp. 147, 153

(S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing

court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards

were applied, even if the decision appears to be supported by substantial evidence.  *Johnson*, 817

F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with

sufficient specificity to allow a court to determine whether substantial evidence supports the

decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the

determination of whether there is substantial evidence in the record to support the decision.  42

U.S.C. § 405(g) (2005); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  "Substantial

evidence has been defined as 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'"  *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258

(2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered

throughout the administrative record.  *Serrano*, 2003 WL 22683342, at *10; *Richardson v.

Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197

(1938)).  "To determine on appeal whether an ALJ's findings are supported by substantial

evidence, a reviewing court considers the whole record, examining the evidence from both sides,

because an analysis of the substantiality of the evidence must also include that which detracts

from its weight."  *Williams*, 859 F.2d at 258.  However, a reviewing court cannot substitute its

interpretation of the administrative record for that of the Commissioner if the record contains

substantial support for the ALJ's decision.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir.

5

1972); *see also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## III.   THE PLAINTIFF

Plaintiff was born on September 21, 1963. (T. at 31, 155.)  She completed the eighth

grade.  (T. at 31, 155.)  Plaintiff worked full time as a nurses' aide until she injured her back

lifting a patient.  (T. at 32-33.)  In her application for benefits, Plaintiff alleged disability due to

back pain, a heart attack, and high blood pressure.  (T. at 124.)  In her Reconsideration Disability

Report, Plaintiff also reported suffering from a hearing impairment.  (T. at 144.)

## IV.   THE ALJ'S DECISION

The ALJ found that (1) Plaintiff has not engaged in substantial gainful activity since

August 2, 1995; (2) Plaintiff suffers from the severe conditions of lumbosacral strain with

sciatica, hypertension and coronary artery disease; (3) Plaintiff's severe impairments do not meet

or equal a listed impairment; (4) Plaintiff's testimony that her symptoms are of such intensity,

frequency or duration as to preclude all work activity is not credible; (5) Plaintiff has the RFC to

perform light work; and (6) the Regulations direct a finding that Plaintiff is not disabled.  (T. at

24-25.)

## V.   DISCUSSION

### A.   The ALJ's Rejection of Opinions Expressed by Plaintiff's Treaters on the Ultimate Issue of Disability is Supported by Substantial Evidence.

Plaintiff argues that the ALJ erred by rejecting the opinions of treaters John J. Cambareri,

M.D. and chiropractor William O. Groetz.  (T. at 12-18.)

When Plaintiff initially injured her back in 1994, she sought treatment from the Groetz

Chiropractic Office.  (T. at 36.)  After Plaintiff's first three visits, Dr. Groetz concluded that

6

Plaintiff should lift no more than ten pounds, that she could stand and/or walk for one or two hours, that she could sit and drive for one or two hours, and that she should avoid bending, climbing and twisting.  (T. at 162, 163, 165.)  In May 2005, Dr. Groetz increased the amount Plaintiff could lift to 20 pounds.  (T. at 166.)  From November 1994 to August 1995, Dr. Groetz consistently opined that Plaintiff could work part time.  (T. at 163-167.)

At visits prior to August 1995, Dr. Cambareri diagnosed Plaintiff with lumbar strain and sciatica.  (T. at 207,  210.)  At the first visit, he suggested that Plaintiff pursue vocational retraining and assessed Plaintiff's disability status as "probably markedly partial".  (T. at 207.)  At the next two visits, Dr. Cambareri noted that Plaintiff was working part-time light duty (T. at 209, 210) and assessed Plaintiff's disability status as "partial".  (T. at 209, 210.)

On August 2, 1995, the onset date for the purposes of Plaintiff's current application for benefits, Plaintiff was "pulled out of work" by Dr. Groetz.  (T. at 169.)  Dr. Groetz opined that activities of daily living and work were delaying Plaintiff's recovery and that Plaintiff was "totally temporarily disabled".  (T. at 169.)

On November 9, 1995, Dr. Cambareri again diagnosed Plaintiff with lumbar sprain.  He suggested that Plaintiff "return to work 20 lbs. maximum lifting.  No repetitive bending.  Suggest trial of therapy at Summit Group."  Dr. Cambareri assessed Plaintiff's disability status as "mildly disabled."  (T. at 211.)

On March 25, 1996, Dr. Cambareri reported: "She is going to PT at the Summitt Group. She stopped now, does not feel this helps.  It did help her posture, but it is not helping with the pain."  Dr. Cambareri assessed Plaintiff's disability status as "not working, partial disability". (T. at 307.)

7

On June 14, 1996, Dr. Cambareri reported that Plaintiff "has lower back pain.  It goes into the left thigh and calf.  It tends to burn in the left lower extremity."  (T. at 212.)  On examination, Dr. Cambareri noted "(t)enderness over the left SI area.  Negative stretch test to 90 on the right seated.  Positive on the left at 45 seated for sciatica.  Good motion of the hips and knees.  Neurologic exam is grossly normal."  (T. at 212.)  Dr. Cambareri's impression was lumbar sprain and sciatica.  (T. at 212.)

On December 27, 1996, Dr. Cambareri reported that Plaintiff "has ongoing pain in the lower back.  It is worse if she does any bending or lifting."  (T. at 213.) On examination, Dr. Cambareri noted that Plaintiff's "spine has tenderness over the lumbar musculature L5 S1 particularly to the right and left of mid line.  There is some spasm brought out in the paravertebral musculature, worse with forward flexion of the spine to 45.  Negative stretch test to 90 bilaterally seated.  Good motion hips and knees.  Neurologic exam is normal."  Dr. Cambareri's impression was lumbosacral sprain and sciatica.  (T. at 213.)  Dr. Cambareri assessed Plaintiff's disability status as "permanently partially disabled at the moderate level in my opinion with respect to these injuries."  (T. at 213.)

The ALJ rejected Dr. Groetz's opinions in full and Dr. Cambareri's in part.  The ALJ noted that "(t)he opinions of disability (total and partial) set forth by Dr. Groetz ... and Dr. Cambareri are opinions on an issue reserved for the Commissioner and ... opinions on an issue reserved for the Commissioner are never entitled to controlling weight, even if offered by a treating source.  However, Dr. Cambareri's opinion regarding the claimant's functional capabilities/limitations is given significant weight because it is consistent with the clinical findings of record, as well as the claimant's reported daily activities."  (T. at 22.)  The ALJ's

decision applied the correct legal standard and is supported by substantial evidence.

The medical opinions of a treating physician are given "controlling weight" as long as they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are not inconsistent with other substantial evidence contained in the record.  20 C.F.R. § 404.1527(d)(2) (2007).

"An ALJ who refuses to give controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir. 2004).   These factors include: (1) the length of the treatment relationship and frequency of examinations; (2) the nature and extent of treatment relationship; (3) the medical evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) any other factors that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d)(2) (2007).  The Regulations require the Commissioner's notice of determination or decision to "give good reasons" for the weight given a treating source's opinion.   20 C.F.R. § 404.1527(d)(2) (2007).

The ALJ's rejection of Dr. Groetz's opinion is supported by substantial evidence. The opinion of a chiropractor is not a "medical opinion" under the Regulations because a chiropractor is not an "acceptable medical source."  20 C.F.R. §§ 404.1513(a) and 404.1527(a)(2) (2007); *Diaz v. Shalala*, 59 F.3d 307, 312-13 (2d Cir. 1995).  Accordingly, the ALJ was not required to give Dr. Groetz's opinion controlling weight.

Regarding Dr. Cambareri, the ALJ rejected only Dr. Cambereri's cursory assertions that Plaintiff was 'partially disabled,' 'totally temporarily disabled,' 'mildly disabled,' and 'permanently partially disabled at the moderate level'.  He gave "significant weight" to Dr.

Cambareri's other opinions.  This partial rejection was appropriate.  A treating source's statement that a claimant is "disabled" is not a "medical opinion" under the Regulations.  20 C.F.R. § 404.1527(e) (2007).  The Regulations explicitly state that the Commissioner is "responsible for making the determination or decision about whether (a claimant) meet(s)  the statutory definition of disability ... A statement by a medical source that (a claimant is) 'disabled' ... does not mean that (the Commissioner) will determine that (the claimant) is disabled."  *Id.* Moreover, it is clear from the context of the medical records that Dr. Cambareri used the term "disabled" in a very different way than the term is defined under the Regulations.  For example, he assessed Plaintiff as suffering from a "partial" disability even when she was working part-time (T. at 209, 210) and referred to her as "mildly disabled" on the same date that he opined that she could lift up to 20 pounds.  (T. at 211.)  Accordingly, the ALJ's treatment of the opinions of Plaintiff's treaters applied the correct legal standard and is supported by substantial evidence.

> **B.**   **The ALJ's Finding that Plaintiff Has the RFC to Perform Light Work is Supported by Substantial Evidence.**

Plaintiff argues that Defendant's determination that she has the RFC to perform light work is not supported by substantial evidence.  (Dkt. No. 8 at 8-18.)

A claimant's RFC represents a finding of the range of tasks he or she is capable of performing despite his or her impairments.  20 C.F.R. § 404.1545(a) (2007).  An  RFC determination is informed by consideration of a claimant's physical abilities, mental abilities, symptomatology, including pain, and other limitations that could interfere with work activities on a regular and continuing basis.  *Id.; Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999)(Hurd, D.J.).

To properly ascertain a claimant's RFC, an ALJ must assess a claimant's exertional capabilities, addressing his or her ability to sit, stand, walk, lift, carry, push and pull.  20 C.F.R. § 404.1569a (2007).  Non-exertional limitations or impairments, including impairments that result in postural and manipulative limitations, must also be considered.  20 C.F.R. § 404.1569a; *see also* 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e).  When making an RFC determination, an ALJ must specify those functions that the claimant is capable of performing; conclusory statements concerning his or her capabilities, however, will not suffice.  *Martone*, 70 F. Supp. 2d at 150.  Further, "(t)he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g. daily activities, observations)."  S.S.R. 96-8p, 1996 WL 374184, at *7 (S.S.A.).  An administrative RFC finding can withstand judicial scrutiny only if there is substantial evidence in the record to support each requirement listed in the regulations.  *Martone*, 70 F. Supp. 2d at 150.

Here, the ALJ concluded that Plaintiff has the RFC to lift and carry twenty pounds occasionally and ten pounds frequently, to stand and walk six hours and sit six hours in an eight-hour workday, and to occasionally climb, balance, stoop, kneel, crouch and crawl.  (T. at 23.) The ALJ's RFC assessment is supported by substantial evidence.  Although the record amply demonstrates that Plaintiff suffers from several severe impairments, no doctor other than Dr. Groetz ever opined that Plaintiff's conditions preclude her from light work.

As noted above, Plaintiff claims that she is disabled because of back pain, high blood pressure, a heart attack, and hearing loss.  (T. at 124, 144.)  Regarding Plaintiff's back, the extensive medical record supports the ALJ's finding that Plaintiff's condition allowed her to

11

perform light work.  In addition to the back treatment provided by Dr. Groetz and Dr. Cambareri,

Plaintiff's back was also consultatively examined by Anthony J. Nastasi, M.D., Ethan Flaks,

M.D., George Kartalian, M.D. and Kalyani Ganesh[1], M.D.  Although Dr. Nastasi was a

consulting physician rather than a treating physician, he examined Plaintiff five times.  (T. at

200.)  None of these physicians opined that Plaintiff's condition was severe enough to prevent

her from doing light work.

On September 23, 1994, Dr. Nastasi conducted a  medical file review, interviewed

Plaintiff, examined Plaintiff, and reviewed MRI film. (T. at 157-161.)  Dr. Nastasi's impression

was "recurrent lumbar complaints with today's examination showing a normal lumbar

examination and negative neurological findings in either lower extremity."  (T. at 161.)  Dr.

Nastasi's opinion was that "(t)he prognosis in this case is good considering the fact that this

patient has had a poor subjective response to her treatment to date ... I feel the patient's degree of

disability is mild (sic) subjective at best[2]."  (T. at 161.)

Dr. Flaks consultatively examined Plaintiff on June 11, 1996.  (T. at 180-182.)  Dr. Flaks

---

[1]     There are two consultative medical reports in the record from Industrial Medicine
        Associates dated November 9, 1998.  (T. at 276-280, 281-283.)  The first lists the
        physician's name as Kalyani Galesh, M.D.  (T. at 276.)  The second is titled
        "Orthopedic Exam" and lists the physician's name as Kalyani Ganesh, M.D.  (T.
        at 281.)  The list of exhibits refers to both reports as being authored by Dr.
        Kalyani Ganesh.  (T. at 4.)  The ALJ refers to the consultant as Dr. Ganesh.  (T. at
        21, 22.)  This Report-Recommendation will, therefore, refer to the physician as
        Dr. Ganesh rather than Dr. Galesh.

[2]     Plaintiff argues that the ALJ should have explicitly rejected this opinion just as he
        rejected the opinions of Dr. Groetz and Dr. Cambareri on the ultimate issue of
        disability.  (Dkt. No. 8 at 12-16.)  Although the explicit rejection that Plaintiff
        advocates would have been a more consistent approach, the ALJ's RFC
        assessment is supported by substantial evidence even if  Dr. Nastasi's statement
        that Plaintiff's "degree of disability is mild subjective at best" is disregarded.

observed that Plaintiff "does not seem to have any great difficulty getting on and off the examining table, but has to change position quite frequently when standing or sitting." (T. at 181.)   On examination, Dr. Flaks found Plaintiff's upper extremities and cervical spine "essentially unremarkable". (T. at 181-182.) Both knees flexed to 120 degrees bilaterally. (T. at 181.) Plaintiff reported pain on backward extension of her hips, abduction, forward flexion, rotation, and lateral flexion. (T. at 181-182.) Dr. Flaks' visual examination of Plaintiff's musculoskeletal system did not reveal any joint deformity or atrophy of any muscle groups. He noted some tenderness with palpation in the paravertebral musculature in the lumbosacral area, but no muscle spasm. He estimated Plaintiff's muscle strength in the lower extremities to be 5/5 on the right side and 4/5 on the left side. Deep tendon reflexes were not elicited in the patellar regions of the Achilles regions. Sensation appeared to be intact throughout Plaintiff's lower extremities. Cerebellar function appeared to be adequate. Plaintiff was able to raise herself on her toes as well as rock back on her heels. She performed about 50% of the squat maneuver with the complaint of lumbosacral spine pain. Straight leg raising was accomplished on the right side to approximately 70 degrees with a complaint of lower back pain which was relieved with flexion of the knee. Straight leg raising on the left side resulted in Plaintiff complaining of pain at about 30-35 degrees. The pain was not relieved with flexion of the knee on this side. Dr. Flaks' assessment was chronic lumbosacral pain. (T. at 182.)

X-rays ordered by Dr. Flaks did not identify "(a) fracture or bony destructive process ... There is mild anterior degenerative lipping of T11 and L4. There is disc space narrowing at the L5-S1 level. There is no spondylolisthesis. The S1 joints are unremarkable. An incidental finding is spina bifida of S1." (T. at 183.)

Dr. Kartalian examined Plaintiff on June 25, 1996.  (T. at 184.)   Dr. Kartalian found that Plaintiff's lumbar spine "reveals no gross spasm.  She forward flexes approximately 40 to 60 degrees.  Extension is to about 20 degrees.  Lateral rotation is to 20 degrees on the left and to about 30 to 40 degrees on the right.  Straight leg raising while seated, shows the claimant has 90 degrees of straight leg raising but, has discomfort on the left radiating to her buttock and lumbar spine, with some tightness to her hamstring; this is not noted on the right.  She has 3+ strength bilaterally.  The neurological examination is within normal limits.  She has no hypesthesia or atrophy."  Dr. Kartalian's impression was acute lumbosacral strain with mild left sided sciatica. (T. at 185.)

On October 3, 1996, Dr. Nastasi observed that Plaintiff walked without a limp.  "On this occasion the patient pointed to the left iliac crest region as where she was experiencing her difficulty.  On forward bend the patient's fingertips were brought to just below knee level with the patient indicating that it caused pain over the left iliac crest region.  Backward extension was 30 degrees with similar location of complaints.  Lateral bends were 30 degrees to the right and left causing similar complaints.  Rotation was 60 degrees to the right with the patient localizing discomfort over the iliac crest on the left with a similar location of complaint rotating to the left 60 degrees."  (T. at 202.)  "Once again throughout the lumbar range of motion there was no evidence of spasming, rigidity or knotting occurring in the paralumbar region.  There was no difficulty balancing on her heels and toes.  Seated at the side of the table full passive extension of the knees was accomplished without any complaint of pain in either leg or lumbar region.  Knee reflexes under reinforcement were barely 1+ as were ankle reflexes.  The patient was again observed lowering herself onto the table without assistance or difficulty.  Straight leg raising on

14

this occasion was limited to 30 degrees bilaterally, on the right with complaints of pulling occurring over both iliac crests, on the left pulling of the left iliac crest region only.  There was no loss of sensory found in either lower extremity, both feet included, when tested with a pinwheel.  Likewise, there was no loss of extension or plantar flexion power noted of either foot or big toe." (T. at 203.)  Dr. Nastasi's impression was "(c)ontinued lumbar complaints, once again with the patient demonstrating negative neurological findings in both lower extremities." (T. at 203.)

Dr. Ganesh consultatively examined Plaintiff on November 9, 1998.  (T. at 276.)  On physical examination, Dr. Ganesh noted that Plaintiff appeared to have no difficulty dressing and undressing or getting on and off the table, that her gait was normal, and that she was able to walk on her heels and toes.  (T. at 277.)  Dr. Ganesh noted that Plaintiff had full range of motion in all joints.  (T. at 278.)  Straight leg raising was negative in a sitting position, lying down on the right positive at 90 degrees, left 75 degrees with lateral flexion limited to 15 degrees by pain.  Rotation was limited by back pain.  (T. at 278.)

Dr. Ganesh examined Plaintiff's cervical spine and noted normal flexion, extension, lateral flexion and lateral rotation with no pain or spasm.  (T. at 282.)  On examination of Plaintiff's upper extremities, Dr. Ganesh noted normal range of motion, full strength, no muscle atrophy or sensory abnormality.  (T. at 282.)  On examination of Plaintiff's spine, Dr. Ganesh noted "normal flexion, extension, lateral flexion 15 degrees limited by pain, and rotation limited by pain.  No tenderness or spasm.  No pelvic tenderness or scoliosis.  There is no spinal kyphosis present.  There is no SI joint or sciatic notch tenderness ... The reflexes at the patellar and Achilles tendons are equal but feeble." (T. at 283.)  An x-ray of Plaintiff's lumbosacral spine

15

showed minimal disc narrowing at L4-5 and L5-S1.  (T. at 283.)

Plaintiff has never been hospitalized as a result of her back pain.  (T. at 36.)  She had not

visited her treating doctors for back pain for a "couple of years" before the ALJ hearing[3].  (T. at

41-42.)  In sum, substantial evidence supports the ALJ's finding that Plaintiff's back impairment

does not prevent her from performing light work.

Similarly, the record shows that Plaintiff's hypertension does not prevent her from

performing light work .  Plaintiff was referred to George Mtanos, M.D., for treatment of her high

blood pressure.  (T. at 216.)  He initially saw her on September 21, 1995.  (T. at 216.)  At follow-

up visits in October 1996 and January 1997, Dr. Mtanos increased Plaintiff's medication dosage.

(T. at 218, 220.)  On March 5, 1997, he noted that Plaintiff's hypertension was well-controlled.

(T. at 220.)  The record does not contain any other documentation of Plaintiff's hypertension.

Accordingly, substantial evidence supports the ALJ's finding that Plaintiff's hypertension does

not prevent her from doing light work.

Regarding Plaintiff's heart condition, the record shows that Plaintiff was admitted to the

ICU Rome Memorial Hospital in the early hours of June 30, 1998, suffering severe chest pain,

nausea and vomiting associated with a myocardial infarction.   (T. at 226.)  Plaintiff was

transferred to State University Hospital in Syracuse on July 6, 1998, to undergo a cardiac

catheterization[4].  (T. at 256.)  Dr. Kamal Takkellapati performed the procedure.  (T. at 258.)

---

[3]      In a report submitted to the ALJ, Dr. Cambareri stated that he had not treated
Plaintiff since July 18, 1997.  (T. at 306.)

[4]

Cardiac catheterization involves passing a catheter (a thin flexible tube) into the
right or left side of the heart. In general, this procedure is performed to obtain

She underwent a stent procedure on July 22, 1998.  (T. at 269.)   On October 2, 1998, a stress test revealed reversible defects involving the distal anterior wall and apex. (T. at 269.)   On October 13, 1998, Plaintiff reported to Dr. Takkelapati that she was experiencing "heaviness or discomfort on climbing upstairs or walking briskly.  She denies any rest pain or chest pain on mild exertion."  (T. at 293.)  As a result, Plaintiff underwent  another cardiac catheterization on October 26, 1998, in an effort to reassess her coronary artery anatomy and prior stent sites.  (T. at 269.)  After the procedure, Dr. Takkelapati's conclusion was "single vessel coronary artery disease, patent stents in the LAD artery, distal spontaneous dissection is seen."  (T. at 271.)   Dr. Takkellapati's impression was "satisfactory patency in the area of two stents... (and) (c)ontinued single-vessel coronary artery disease with evidence of dissection and a 99% narrowing."  (T. at 275.)

On November 9, 1998, Dr. Ganesh opined that "(a)lthough (Plaintiff) appears to have no gross physical limitation, with the history of MI and chest pain it could limit her from significant gainful activity."  (T. at 278.)

On November 17, 1998, Plaintiff told Dr. Takkelapati that  "(s)ince her catheretization she has been feeling good except for occasional chest pain on moderate exertion.  She states that she is feeling fatigued.  This she states has been worse over the last few weeks." Plaintiff denied any shortness of breath or  rest pains.  (T. at 295.)

On August 5, 1999, Dr. Takkellapati reported that he advised Plaintiff "to avoid any

_____

diagnostic information about the heart or its blood vessels or to provide treatment in certain types of heart conditions.  Medline Plus, http://www.nlm.gov/medlineplus/ency/article/003419.htm#Definition (last visited October 29, 2007).

strenuous exertion, but she could do light to moderate exertion as long as she is not experiencing chest pains."  (T. at 315.)

The record supports the ALJ's finding that Plaintiff's heart condition did not prevent her from performing light work.  Although treating physician Dr. Takkelapati and consultant Dr. Ganesh both found that Plaintiff's activities were somewhat limited by her condition, neither found that Plaintiff was completely precluded from activity.  Dr. Ganesh opined that Plaintiff's condition *could* limit her from "significant" gainful activity, but did not define the term.  Dr. Takkelapati advised Plaintiff to avoid "strenuous" exertion, but did not preclude "light to moderate exertion."  Accordingly, the ALJ's finding that Plaintiff's heart condition does not prevent her from performing light work is supported by substantial evidence.

Although the record demonstrates that Plaintiff suffers some hearing loss, substantial evidence supports the ALJ's finding that Plaintiff can perform light work despite her hearing impairment.  Harold Small, M.D., consultatively examined Plaintiff on July 9, 1996.  (T. at 188-191.)  Plaintiff told Dr. Small that she does not wear her hearing aid because it "makes noise most of the time." (T. at 188.)   Dr. Small found that Plaintiff's ears "were unremarkable ... Both eardrums were intact but they were scarred...Her hearing handicap is no more than 10%."  (T. at 189.)

Plaintiff argues that the ALJ erred by considering her impairments separately rather than in combination.  (Dkt. No. 8 at 11.)  However, Plaintiff does not cite any evidence in the record showing that Plaintiff's impairments, in combination, prevent her from performing light work.  In fact, two agency consultants who made RFC assessments based on the medical record concurred that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or

18

walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday and

occasionally climb, balance, stoop, kneel, crouch, and crawl.  (T. at 193-194, 299-300.)  Each

consultant noted that there were no treating or examining source conclusions that were

significantly different from those findings.  (T. at 198, 304.)  Accordingly, the ALJ's RFC

assessment is supported by substantial evidence.

      **C.**      **The ALJ's Credibility Determination is Supported by Substantial Evidence.**

      Plaintiff argues that the ALJ improperly rejected her subjective complaints of pain.  (Dkt.

No. 8 at 21-24.)

      "An [ALJ] may properly reject [subjective complaints] after weighing the objective

medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but

must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the

determination is supported by substantial evidence.'"  *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651

(N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, Civ. No. 96-9435, 1999 WL 185253, at *5

(S.D.N.Y. Mar. 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility

assessment must be based on a two-step analysis of pertinent evidence in the record.  20 C.F.R. §

404.1529 (2007); *see also Foster v. Callahan*, Civ. No. 96-1858, 1998 WL 106231, at *5

(N.D.N.Y. Mar. 3, 1998) and SSR 96-7p.  First, the ALJ must consider whether there is an

underlying medically determinable physical or mental impairment(s) that could reasonably be

expected to produce the claimant's pain or other symptoms.  SSR 96-7p.  This finding does not

involve a determination as to the intensity, persistence, or functionally limiting effects of the

claimant's pain or other symptoms.  *Id.*  If no impairment is found that could reasonably be

expected to produce pain, the claimant's pain cannot be found to affect the claimant's ability to

do basic work activities.  An individual's statements about his pain are not enough by themselves to establish the existence of a physical or mental impairment, or to establish that the individual is disabled.  *Id.*

However, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been established, the second step of the analysis is for the ALJ to evaluate the intensity, persistence, and limiting effects of the pain or symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities.  *Id.* When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors:  (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. § 404.1529(c)(3) (2007).

An ALJ's evaluation of a plaintiff's credibility is entitled to great deference if it is supported by substantial evidence.  *Murphy v. Barnhart*, Civ. No. 00-9621, 2003 U.S. Dist. LEXIS 6988, at *29-*30 (S.D.N.Y. Jan. 21, 2003) (citing *Bischof v. Apfel*, 65 F. Supp. 2d 140, 147 (E.D.N.Y. 1999) and *Bomeisl v. Apfel*, Civ. No. 96-9718, 1998 U.S. Dist. LEXIS 11595, at *19 (S.D.N.Y. July 30, 1998) ("Furthermore, the ALJ has discretion to evaluate a claimant's credibility . . . and such findings are entitled to deference because the ALJ had the opportunity to

observe the claimant's testimony and demeanor at the hearing.")).

Plaintiff testified that she is not able to work because "I have a hard time doing a lot of things.  I can't sit and stand for very long at one point in time."  (T. at 35.)  Plaintiff testified that she can sit in one position for 15 to 20 minutes before she has to change positions due to the pain.  (T. at 39.)   Plaintiff testified that her ability to lift is "limited to ten pounds."  (T. at 40.)

Plaintiff could not recall a day in the year prior to the hearing when she did not experience back pain.  (T. at 52.)  On a scale of one to ten, her consistent everyday level of pain is a five.  (T. at 52.)  Plaintiff has difficulty sleeping because of her discomfort.  (T. at 42.)

Plaintiff testified that as a result of her heart surgery she experiences chest pain and shortness of breath.  (T. at 38.)  Plaintiff testified that "no certain thing" brings on her chest pains: "I could be walking.  I could be doing my water exercise.  I could be sitting ... It just comes when it does."  (T. at 44.)  The onset of pain is totally unpredictable.  (T. at 53.)  The pain subsides within five to ten minutes of her taking her medication.  (T. at 44.)  After taking her medication, Plaintiff rests for a half hour or 45 minutes, until she no longer feels dizzy and light-headed.  (T. at 44.)  This happens two or three times a week.  (T. at 44.)

Regarding her hearing limitation, Plaintiff testified "It's embarrassing.  I misunderstand a lot.  I don't hear a lot and I have to ask over, you know, and I look at everybody when they're talking to me so I can kind of read their lips."  (T. at 48.)

Plaintiff lives with her father and her 17-year-old son.  (T. at 38.)  Her father was hospitalized for several months in 1998, and Plaintiff was expected to care for him when he returned home.  (T. at 269.)  Regarding chores, Plaintiff testified that "My son does a lot of it.  I try to do what I can, dishes, vacuuming.  I can't do it all at once, but I take my time throughout

the day." (T. at 38.)  When she vacuums, she works for about fifteen minutes at a time and then

stops.  (T. at 46.)  When she does the dishes, she does a "little, then sit down, and then get back

up and do them again." (T. at 46.)   Plaintiff's son does the cooking.  (T. 38.) When shopping,

Plaintiff's son does the lifting and carrying and Plaintiff pays.  (T. at 39.)  Plaintiff had not done

any yard work for the year and a half preceding the hearing.  (T. at 46-47.)  Plaintiff's father

testified that Plaintiff's son helps her when she goes to the store and does the laundry.  (T. at 55.)

Plaintiff's father testified that after Plaintiff's heart attack "she just is not the same ... She's tired

... When she tries to do stuff ... she gets tired.  She's trying to vacuum the floor, she'll do a little

bit and then she's got to stop.  She's doing dishes, she ... gets her table cleared off and gets her

dishes in the sink and everything.  She goes and sits down for a little bit ... and then goes back

and continues ... But to work, like I said, to vacuum the whole living room, she can't do that no

more."  (T. at 55.)

        Before she was injured, Plaintiff was active outside the home.  She used to bowl and

rollerskate.  (T. at 51.)  Since her injuries, Plaintiff testified that she does needlework, goes for

walks, and visits friends during the day.  (T. at 39.)  When she walks, she walks around the

block.  (T. at 40.)  She does that a couple of times a day.  (T. at 51.)  She also walks to the store.

(T. at 39-40.)  The store is a seven-minute walk away.  (T. at 51-52.)  Plaintiff does water

exercises two to three times a week.  (T. at 40.)  She also attends bingo about twice a month at a

place where she "can stand or sit."  (T. at 51.)  Plaintiff's father testified that Plaintiff has cut

back on socializing and activities.  (T. at 55.)  For example, at a recent family wedding, Plaintiff

did not stay for the reception because she was too tired and her back was hurting.  (T. at 55-56.)

He testified that whereas Plaintiff had been an active person, her only real activity anymore was

"she goes out and walks, tries to walk around the block."  (T. at 56.)

Plaintiff's father drove her to the hearing.  The drive took them one hour.  (T. at 49.)
Plaintiff was able to move around during the drive because her father drives a van.  (T. at 50.)
Plaintiff limits her driving to 20 miles.  (T. at 50.)    Plaintiff had not taken any extended trips in
the year prior to the hearing.  (T. at 50.)

Regarding Plaintiff's credibility, the ALJ found that:

> Given the lack of regular treatment for her back, the lack of prescription medications
> for her back, her non-compliance with medical treatment, the positive effects of
> treatment on her cardiac condition, Dr. Small's findings and conclusions, the
> claimant's reported daily activities and the probative medical opinions of record, it
> is not credible that her symptoms are of such intensity, frequency or duration as to
> preclude all work activity.

(T. at 23.)

Substantial evidence supports the ALJ's findings.  As noted above, Plaintiff did not
receive regular treatment for her back in the years preceding the ALJ hearing.  (T. at 41-42, 306.)
The record contains very few references to Plaintiff taking prescription medications for her back.
(T. at 212, 307.)  Rather, she testified that she uses hot baths, ice packs, and ibuprofen to relive
her back pain.  (T. at 52.)  This is consistent with her report to Dr. Nastasi on October 3, 1996,
that she eases her back pain by taking Advil or Tylenol, using cold packs and taking  hot baths.
(T. at 202.)  Dr. Takkellapati noted that Plaintiff   "(h)as been noncompliant with therapy."  (T.
at 269.)  As discussed above, the treatment that Plaintiff received for her hypertension and heart
condition was largely successful.  As noted above, Dr. Small concluded that Plaintiff's hearing is
90% intact.  (T. at 189.)  And finally, the extent of Plaintiff's daily activities indicates that
Plaintiff is capable of light work.  For instance, in a Disability Report dated September 2, 1998,

23

just two months after Plaintiff's heart attack, the examiner noted that Plaintiff arrived for her

appointment accompanied by three toddlers whom she was babysitting.  (T. at 132.)

Accordingly, the ALJ's assessment of Plaintiff's credibility is supported by substantial evidence.

### D.   The ALJ Erred by Relying on the Grid Despite Plaintiff's Nonexertional Limitations.

Plaintiff argues that the ALJ erred by failing to consult a VE.  (Dkt. No. 8 at 22.)

Plaintiff is correct.

In order to make the determination under the fifth step of the sequential analysis

described above, the Commissioner ordinarily uses the Medical Vocational Guidelines, known as

the "Grid":

> In meeting [his] burden of proof on the fifth step of the sequential evaluation process . . . , the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2 . . . . The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy.  Generally the result listed in the Grid is dispositive on the issue of disability.

*Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (footnotes omitted): *Rosa v. Callahan*,

168 F.3d 72, 78 (2d Cir. 1999); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).  The Grid divides

work into sedentary, light, medium, heavy and very heavy categories, based on the extent of a

claimant's ability to sit, stand, walk, lift, carry, push, and pull.  *Zorilla*, 915 F. Supp at 667 n.2.

The Grid yields a decision of "disabled" or "not disabled," taking into account the claimant's

RFC, age, education, and prior work experience.  20 C.F.R. § 404.1569 and 20 C.F.R. § 404,

Subpt. P, App. 2, § 200.00(c).

Where there are "discrepancies" between the claimant's abilities and the Grid factors,

where the claimant's exertional impairments are compounded by significant non-exertional

impairments that limit the range of work an individual can perform, or where there is no

substantial evidence that a claimant can perform the full range of a particular category of work,

then the relevant facts are to be considered in light of the vocational considerations outlined in

the Code of Federal Regulations at 20 C.F.R.  § 416.969(a).  If a claimant cannot perform the full

range of an exertional category of work, then an individual assessment may be required.  *Zorilla*,

915 F. Supp at 667 (citing *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989)).

When "a claimant's nonexertional impairments significantly diminish[5] (his or) her ability

to work, the Commissioner should be required to present the testimony of a vocational expert or

other evidence concerning the existence of jobs in the national economy for an individual with

claimant's limitations."  *Dwyer v. Apfel*, 23 F. Supp. 2d 223, 229-230 (N.D.N.Y. 1998).

As discussed above, the record shows that Plaintiff suffers from some loss of hearing.

(T. at 189.)  In addition, the ALJ found that Plaintiff could only occasionally climb, balance,

stoop, kneel, crouch and crawl.  (T. at 23.)  Limitations on hearing, climbing, balancing,

stooping, kneeling, crouching and crawling are nonexertional limitations.  S.S.R. 96-9p, 1996

WL 374185, at *7-8; 20 C.F.R. § 404.1569a (c)(2007).

Substantial evidence supports a finding that Plaintiff's hearing loss did not significantly

---

[5]      A claimant's work capacity is "significantly diminished" if there is an additional
loss of work capacity that so narrows a claimant's possible range of work as to deprive him of a
meaningful employment opportunity.  *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

diminish her ability to work.  As noted above, the only medical evidence in the record regarding Plaintiff's hearing loss is from Dr. Small, who opined that Plaintiff's "hearing handicap is no more than 10%."  (T. at 189.)  The minor nature of Plaintiff's hearing loss is demonstrated by the fact that she never sought treatment, despite receiving extensive treatment for her other conditions.  Accordingly, the ALJ was not required to present VE testimony regarding the effects of Plaintiff's hearing loss.

The ALJ should, however, have elicited VE testimony regarding the effect of Plaintiff's inability to frequently climb, balance, stoop, kneel, crouch and crawl.   When a claimant's capacity for light work is reduced by his or her ability to frequently kneel or crouch, it is error for an ALJ to rely on the Grid.  *Parish v. Apfel*, 70 F. Supp. 2d 279, 284-285 (W.D.N.Y. 1999). Accordingly, remand is appropriate.

**WHEREFORE,** it is hereby

**RECOMMENDED**, that this matter be remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g),[6] for further proceedings consistent with the above.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1);

---

[6]      Sentence four reads "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

FED. R. CIV. P. 72, 6(a), 6(e).


Dated: November 5, 2007
      Syracuse, New York

                            George H. Lowe
                         United States Magistrate Judge